Charles Lee **WALTERS** and Nancy Jane Walters Stevens, a minor, by Eloise Walters, her Guardian, Plaintiffs-Appellants,

v.

H. L. **LAWLESS,** Odist Low, and the Equitable Life Assurance Society of the United States, a Corporation, Defendants-Appellants.

No. 50167.

Supreme Court of Missouri,

Division No. 2.

July 13, 1964.

Motion for Rehearing and to Transfer to Court En Banc Denied Sept. 14, 1964.

C. A. Powell, Powell, Jones & Ringer, Dexter, for plaintiffs-appellants.

Wayne B. Wright, Henry C. Bryan, Jr., McDonald, Barnard, Wright & Timm, St. Louis, Joe Welborn, Bloomfield, Claude Arnold, Dexter, James E. Spain, Briney & Welborn, Bloomfield, for defendants-appellants.

BARRETT, Commissioner.

This is another case with its origin in that everlastingly vexatious phrase, this time in a 1913 will, "heirs of the body." The plaintiffs are the great-grandchildren of the 1913 testator John N. Miller. His will, insofar as material, devised his land in fractional shares to his daughters, here to his daughter Minnie a one-sixth fractional interest for life "with remainder to the heirs of their bodies." By reason of the several fractional devises and alleged ambiguities Mr. Miller's executors instituted a suit, joining his wife and children, to construe the will. The will was construed resulting in a finding, subject to certain adjustments to bring about equality in value, that all real estate should be valued as a whole "and divided into six equal parts, one of which should then be conveyed to each of said adult devisees, whether in fee, or only for life with remainder to others." Following this decree the widow and all other devisees of John N. Miller, together with their spouses, on September 7, 1914, executed a deed, the parties now call it a partition deed, by which they conveyed 290.21 acres to Minnie Walters "during her life with the remainder to the heirs of her body as devisees under the will of John N. Miller." It does not appear what became of the balance of the 290.21 acres, but in 1936 two separate eighty acre parcels of the tract were sold under the Jones-Munger Act for delinquent taxes for the years 1930-1935 to A. and Estelle Sophian. The Sophians assigned these certificates, one for $276.77 and the other for $419.98, to M. L. Manion and accordingly in 1938 the Collector of Stoddard County executed deeds conveying the 160 acres to Mr. Manion. The next step was that on November 24, 1937, Minnie B. Walters the daughter and devisee of John N. Miller (then single and aged 58 years) and grantee in the 1914 deed, together with her only son Lee and his wife Eloise (the father and mother of the present plaintiffs, aged 22 and 19 years at the time of trial), for a recited consideration of $500 executed a quitclaim deed to Mr. Manion to the 160

acres. On November 9, 1938, M. L. Manion, a widower, for a recited consideration of "$1.00 and other valuable consideration" deeded the 160 acres to his daughter and son-in-law Alvin and Sarah B. Smyth. And while R. Kip Briney had been the collector and issued the original tax certificates to the Sophians, Alvin Smyth was the collector in 1938 and executed to the then holder of the tax certificates, Manion, the tax deeds. Thus the title and the parties stood in 1938. In 1956 the Smyths executed a deed of trust, securing a $12,000 note, in favor of the Equitable Life Assurance Society and, subject to the balance due on the indebtedness, in January 1959, for a total price of $28,000 conveyed the 160 acres to the defendant H. L. Lawless. This is the history in brief outline of the opposing titles; on the one hand Charles and Nancy Walters (Stevens) great-grandchildren of the 1913 testator Miller, grandchildren of the 1914 grantee Minnie and children of Lee and Eloise (Nancy's guardian) grantors in the 1937 deed, or, in short, "the heirs of the body" against, on the other hand, H. L. Lawless and the Equitable Life Assurance Society, purchasers, grantee and mortgagee from and through the successors to the purchaser at the 1936 tax sale. The circumstance or event that gives rise to or makes at all possible the institution of this action is that Lee Walters, Minnie's son and the father of these plaintiffs, died in 1952, aged 43 years, prior to his mother. Minnie died March 16, 1959 and it is thus that the plaintiffs became the "heirs of the body" within the meaning of the 1913 will and 1914 deed. And, as stated, Nancy is represented here by her mother who was of course Lee's wife and a grantor in the 1938 quitclaim deed to Manion.

In these background circumstances Charles Lee Walters and Nancy Jane Walters Stevens, brother and sister, as "heirs of the body" instituted this suit against Lawless, his tenant Low, and the mortgagee insurance company, to quiet the title to the 160 acres of land in Stoddard County, claiming of course that they are the fee

simple owners. They offer to refund to the defendants all taxes paid by them and their predecessors in title. In a second count they ask for the recovery of a large sum of money by way of rents and profits due a fee simple owner. In an answer and other pleadings not necessary to set out here the defendants assert Mr. Lawless' purchase from the Smyths for $28,000 and claim that he and the mortgagee are bona fide purchasers for value without notice of defects in his title, that he made improvements of $15,000 upon the land and was in law and in fact the fee simple owner of the land free of the plaintiffs' claims.

Having gone thus far in outlining the essential facts perhaps these additional circumstances should be noted before facing up to and meeting the issues involved upon the appeals. In 1936, 1937 and 1938, thirty-five acres of the farm were in woods and the Smyths cleared and put in cultivation about thirty acres of the wooded area. And throughout these years and until the Lawless occupancy there was virtually no drainage and the land often flooded causing the loss of crops. And prior to the purchase by Lawless there were no improvements whatever on the 160 acres of land. Before buying the farm an abstract of title was brought down to date and Mr. Lawless had a Bloomfield lawyer examine the abstract. The lawyer gave Mr. Lawless his written opinion that, subject to the Equitable's deed of trust, the title to the land was "well vested in Alvin Smyth and Mildred J. Smyth." After completing his contract of purchase Lawless caused adequate drainage ditches to be constructed, built a house, granary and numerous other improvements, all, he says, before he was aware of or was given notice of the plaintiffs' claims. On May 11, 1959, plaintiffs' counsel wrote Lawless a letter notifying him and for the first time openly asserting the claims of Charles and Nancy. At that time (a point now made much of by counsel for Charles and Nancy) the new chicken house was not finished, Lawless completed its construction after receipt of the letter or notice. Again, with respect to

the facts, it should be emphasized that this is but a brief summary of a two-volume record and numerous exhibits all concerning a rather involved if not complicated situation.

In its decree, again summarizing briefly, the court found that on the death of the grandmother, Minnie B. Walters, on March 16, 1959, the fee simple title to the 160 acres of land became vested in Charles and Nancy, the "heirs of the body." The court found that in 1936 and 1937, when plaintiffs' father and mother and grandmother executed the quitclaim deed that the value of the land was $4,000, $25 an acre, that 35 acres had not been cleared and that subsequently Lawless "in good faith and prior to notice of adverse title of Plaintiffs" provided drainage ditches, built a house and made many other improvements totaling in value $20,000. But the court found that since March 16, 1959, the plaintiffs Charles and Nancy were entitled as owners to income and rental value of $9,200 and that Lawless therefore was entitled to a net recovery of $11,601.59 "subject only to general and special taxes thereon, together with any rights, if any, that have vested in the Equitable Life Assurance Society of the United States." All parties, both plaintiffs and defendants, have appealed from this judgment and decree.

Five separate briefs have been filed and numerous issues, many of them collateral to and dependent upon how the crux of the matter is decided, have been exhaustively presented. But after noting certain distinctions, or, more accurately, after calling attention to certain matters that are not in point of fact involved, the cause turns on a single factor or claim. The trial court expressly found that there was no evidence of fraud or collusion between Manion and his son-in-law Smyth, the county collector. The court found that the consideration for the tax sales was not inadequate—in short, the court specifically found that *the tax sales were valid and "would have divested all the interest of the Plaintiffs herein, had it not been for conveyances appearing of*

*record subsequent to said tax sales."* (Emphasis supplied throughout the opinion.) The appellant "heirs of the body," respondents as far as the issue of title is concerned, do not challenge or question this finding. And if this finding of the court is not sufficient to dispose of what is often a litigated point in these cases; it must be carefully noted that this is not an instance in which a life tenant, Mrs. Walters, and her son Lee as a possible "heir of the body" collaborated and purposefully agreed to permit the taxes to become delinquent and the land to sell at a tax sale for the purpose of destroying remainders. Neither the life tenant, Mrs. Walters, nor anyone else with a possible interest, either life estate or remainder, purchased at the tax sale or subsequently bought in an outstanding interest or in any manner again came into interest or title in the land. Thus the appeal is not concerned with a life tenant purchasing at a tax sale, or intentionally participating in an execution sale for the obvious and avowed purpose of destroying remainders. Moore v. Moore, Mo., 329 S.W.2d 742; Gordon v. Tate, 314 Mo. 508, 284 S.W. 497; and McCune v. Goodwillie, 204 Mo. 306, 102 S.W. 997, a leading case relied on by the Walterses here. Upon this record and the briefs of "the heirs of the body" it stands admitted, or conceded, therefore, "had it not been for conveyances appearing of record subsequent to said tax sales," that the land was subject to being sold for delinquent taxes for the years 1930 to 1935 and that such a valid tax sale necessarily carried with it or destroyed the remainders and conveyed to Sophian, his assignee Manion and to all subsequent purchasers in that chain a fee simple title. Annotation 75 A.L.R. 416; Ragan v. Looney, Mo., 377 S.W.2d 273 and the authorities there collected.

Referring again to the decree and the finding "had it not been for conveyances appearing of record subsequent to said tax sales," it was the theory of the trial court and it is the basic and underlying theory of counsel for Charles and Nancy ("heirs of the body") that when Manion, after the tax sales on November 4, 1936, took the quitclaim deed from Mrs. Walters and Lee and his wife Eloise (the guardian here) on November 26, 1937, he and all subsequent purchasers acquired Minnie's life estate only and were therefore relegated to the position she would have occupied had she purchased at the tax sale. Thus they skip the tax sale and do not directly challenge its validity but contend that the subsequent transfers, particularly the quitclaim deed and the assignment of the tax certificates from Sophian to Manion places the parties and the title in the position they would have occupied had their grandmother and their father purchased at the tax sale and conveyed to Manion. It is said that this conveyance, the quitclaim deed, coming as it did before the assignment of the tax certificates to Manion, constituted a mere payment of the taxes for the benefit of the remaindermen plaintiffs. One quotation from the Walterses' brief will suffice to illustrate their basic claim and theory: "It was Manion's duty, as the owner of Mrs. Walters' life estate to pay all taxes she was obligated to pay during her lifetime. He did not strengthen his title nor destroy the interest of the heirs of the body of Minnie B. Walters by purchasing the outstanding tax certificates, since he already owned the life estate of Minnie B. Walters and then obtained the tax deeds to the property." Since all these matters are apparent from the abstract of title it is said that Lawless in purchasing the property in 1959 and Equitable in taking the deed of trust from the Smyths "acquired no better title to the land than Manion had."

Numerous cases and annotations, in addition to those cited by the parties, on every phase of the general subject and of this particular case have been collected and considered but it would not be helpful to encumber this opinion with their citation. There is no disposition to infringe upon established precedents or to change the rules or to add to the complexities of "heirs of the body," but this case and its particular facts does not clearly fall within any of the

settled precedents. "The Destructibility of Contingent Remainders in Missouri" Willard L. Eckhardt, 6 Mo.L.R. 268; 25 Mo. L.R. 392. It will suffice to distinguish two of the cases relied on by the Walterses and thus illustrate their basic theory and demonstrate, possibly, its inapplicability to the particular circumstances of this case, Bullock v. People's Bank of Holcomb, 351 Mo. 587, 173 S.W.2d 753, and Mathews v. O'Donnell, 289 Mo. 235, 233 S.W. 451. An italicized quotation from the court's recitation of a part of the pleadings which were the ultimate facts will indicate the general rule and suffice to distinguish the O'Donnell case: "It particularly alleges that one Joseph B. Kinney in 1871 *became the owner of an estate therein for life of Fannie A. D. Mathews, and as such owner it was his duty to pay the taxes on the land, but in violation of said duty, and with the intent of acquiring the estate of the owners of the remainder in fee* of said property, *neglected to pay said taxes* and permitted them to become delinquent. Judgment was obtained by the state for said delinquent taxes, and sale made thereunder, *and at such sale said Joseph B. Kinney bid in a part of these lands and caused a sheriff's deed thereto to be made to his mother, Matilda Kinney, thereby attempting to acquire the remainder estates against plaintiff. The defendants claim ownership under deeds made by said Joseph B. Kinney and his mother, Matilda, and had knowledge before the execution of such deeds of 'the facts and circumstances herein recited.'"* In conclusion as to the record and title of the O'Donnells the court said, "The tax deed informed them that the life tenants had suffered the land to go to sale for delinquent taxes which the law required them to pay." Mathews v. O'Donnell, 289 Mo. l. c. 248, 268, 233 S.W. l. c. 452, 459. In the People's Bank of Holcomb case, a 1916 deed, prior to the marriage of J. R. and Elna Bullock, conveyed to Elna a life estate and "the remainder in fee to the bodily heirs of said Florence Elna Bullock." Subsequently the People's Bank of Holcomb became the holder of a $3,000 note secured by a deed of trust on this property, the instruments being executed by J. R. Bullock, the grantor in the 1916 deed, his wife Elna and his daughter, by a prior marriage, Pearl and her husband. In 1926 the bank obtained a judgment on the note against all these parties, and, it should be carefully noted, on October 28, 1935, upon specific levy and execution *"on 'all the right, title and interest' of the mother, Elna Bullock, only,"* or, as stated at another point in the opinion, *"(t)he defendant bank's levy and execution sale under its judgment were only directed against the mother's life estate"* upon which the bank became the purchaser upon a bid of $600. Purchasing in these circumstances in 1935 the bank became the owner of Elna Bullock's life estate and on January 2, 1936, under this title went into possession of the land. As to a part of the whole tract of land, on November 12, 1935, fourteen days after purchase at the execution sale and forty-nine days after it entered into possession of the entire 200 acres, the bank purchased 80 acres at a tax sale. In these circumstances the court said, "In other words, when the bank acquired the equitable title on November 12, 1937, two years after the sale, and when it acquired the legal title (if any) by the tax deed, on November 13, 1939, it (the bank) had long been in possession in right of Elna Bullock's life estate." Therefore, since the bank's possession and its only title was that of the life estate its subsequent purchase at a tax sale "inured pro tanto to the benefit of the plaintiff as remainderman upon his making contribution within a reasonable time." Thus in its final analysis, as is apparent from the court's citation of the annotations "Duty of life tenant * * * to pay taxes," 17 A.L.R. 1384, 94 A.L.R. 311, 126 A.L.R. 862, the case fell within the indicated general rule.

█ It is true, under the Jones-Munger Act, that the 1936 owners and occupants, Minnie and her son Lee, had two years in which to redeem the land (V.A.M.S. §

140.340) and these plaintiffs (Charles Lee was born in 1936, Nancy was only 17 when the suit was filed in 1959) in "any lands belonging to them sold for taxes," two years after the removal of their disability had a right to redeem or to institute an action for that purpose. V.A.M.S. §§ 140.350, 140.590. Furthermore, as indicated, it was the duty of any tenants for life to pay taxes. Mathews v. O'Donnell, supra. But here the court has found that the tax sale is valid. There was no collusion between the life tenant, Minnie, and the purchaser at the tax sale, Manion, and there was no fraud or upon this record an intentional, purposeful destruction of a contingent remainder. Ragan v. Looney, supra; Eckhardt, "The Destructibility of Contingent Remainders in Missouri," 6 Mo.L.R. 268, 25 Mo.L.R. 392. The grandmother, Minnie, lived until 1959, the father Lee died in 1952, and there was in all the years no restitution of the $500 and other than the formal tender of taxes now made by the plaintiffs there has not been in 23 years an offer or attempt to redeem. The circumstances in which the quitclaim deed was executed are not known, the grantee, Manion, and two of the grantors, Minnie and Lee, are dead. All that appears is that plaintiffs' grandmother and father and mother, one year and twenty-two days after the tax sale, for a recited consideration of $500 conveyed to Manion. Neither their mother, guardian here of Nancy and a party to the quitclaim deed, nor anyone on behalf of the plaintiffs, until after the 1957 purchase by Lawless and after his making improvements in excess of $14,600 made known their claims. The first notice Lawless had was a letter from plaintiff's counsel on May 11, 1959. In 1936 the value of the land (there were then no improvements), according to the court's finding was $4,000, $25 an acre. The land itself and its drainage have been improved, at least 30 acres of cultivatable land have been added. But in 1959 the improvements alone, the court found their value to be $20,000, were five times greater than the 1936 or 1937 value of the entire tract of land. If these young plaintiffs, Charles and Nancy, have been wronged, aside from their great-grandfather's use of "the heirs of their bodies," the initial injury was the conduct of their grandmother and their father and mother in not paying the taxes as was their duty, in not attempting to redeem the land from the 1936 sale and finally in transferring the title to Manion for $500. If there has been in these respects a default in duty on the part of the plaintiffs' grandmother and their mother and father there is no obviously compelling reason at this late date for penalizing Lawless whose most grievous fault has been his complete unawareness of the knowledge imparted by an abstract of title and his reliance on the opinion of a lawyer as to the validity of his title. The sum and substance of the matter, the essence of the case, is that in the particularly detailed circumstances of this record, and in the absence of a directly controlling precedent to the contrary, it would be inequitable to permit these remaindermen solely because they are "heirs of their bodies" to now claim and assert their remainder interests and for the courts to attempt by an accounting between the parties to fairly settle and adjust their respective rights and claims. Cockrill v. Hutchinson, 135 Mo. 67, 76, 36 S.W. 375; Souders v. Kitchens, 345 Mo. 977, 981, 137 S.W.2d 501, 504; Hunott v. Critchlow, 365 Mo. 600, 612, 285 S.W.2d 594, 602.

In this view of the case it is not necessary to consider the numerous other matters briefed and argued, and the cause is reversed and remanded for the entry of a judgment and decree conforming to this opinion.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.